IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| LISA GLENNON,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>PERFORMANCE FOOD GROUP, INC., et al.,<br><br>　　　　Defendants. | CIVIL ACTION NO.: 2:20-cv-38 |

**O R D E R**

This matter is before the Court on Defendant Performance Food Group, Inc.'s Motion to Compel.  Doc. 27.  Plaintiff filed a Response, and Defendant filed a Reply.  Docs. 28, 30.  For the reasons discussed below, the Court **GRANTS** the Motion to Compel.

**PLAINTIFF'S ALLEGATIONS AND PROCEDURAL HISTORY**

Plaintiff makes the following allegations in her Complaint.  On November 26, 2018, John Doe 1 and John Doe 2, employees of Performance Food Group, loaded, packed, and delivered a tractor-trailer full of provisions to the Kingsland Cracker Barrel.  Doc. 1-1 at 1, 3. Plaintiff, a shift leader at the Kingsland Cracker Barrel, was tasked with scanning each item in Defendant Performance Food Group's tractor-trailer to complete inventory for the Kingsland Cracker Barrel.  Id. at 3.  While scanning a palette, a case of glass bottles fell from a neighboring palette onto Plaintiff's face, neck, and shoulder.  Id.  Plaintiff alleges the accident caused severe injuries, including injuries and fractures to her left jaw; injuries to her left shoulder and neck requiring surgical repair; and injuries to her brain and spinal column, which she claims caused seizures, blackouts, and additional ongoing neurological problems.  Id.

Defendant Performance Food Group has filed a Motion to Compel, seeking to compel Plaintiff to participate in two Independent Medical Examinations ("IMEs")—a neuropsychiatric examination and a neuropsychological examination. Docs. 21, 27. Plaintiff filed a Response in opposition, doc. 28, and Defendant filed a Reply, doc. 30.

## DISCUSSION

**I.     Neuropsychiatric and Neuropsychological IMEs**

**A.     Legal Standard**

Federal Rule of Civil Procedure 35(a)(1) provides, "The court where the action is pending may order a party whose mental or physical condition . . . is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner." The Rule explains a party moving for such an examination must make a showing of good cause. Fed. R. Civ. P. 35(a)(2)(A). Thus, a medical examination should take place if two conditions are met: (1) a party has put her mental or physical condition in controversy; and (2) good cause exists. Stevenson v. Stanley Bostitch, Inc., 201 F.R.D. 551, 553 (N.D. Ga. 2001). "A plaintiff in a negligence action who asserts mental or physical injury . . . places that mental or physical injury clearly in controversy and provides the defendant with good cause for an examination to determine the existence and extent of such asserted injury." Schlagenhauf v. Holder, 379 U.S. 104, 119 (1964). A factor relevant to the "good cause" inquiry is whether the information could be obtained by other means. Winstead v. Lafayette Cnty. Bd. of Cnty. Commissioners, 315 F.R.D. 612, 616 (N.D. Fla. 2016) (citing Marroni v. Matey, 82 F.R.D. 371, 372 (E.D. Pa. 1979)). Additionally, whether the plaintiff has retained her own experts and intends to prove her claims through their testimony is also a relevant factor to determining good cause. Ornelas v. S. Tire Mart, LLC, 292 F.R.D. 388, 392 (S.D. Tex. 2013).

2

### B.      Analysis

Defendant asserts Plaintiff has put her mental condition in controversy by alleging a traumatic brain injury resulted in continuing cognitive dysfunction and other neurological issues. Doc. 21-1 at 6–9.  Plaintiff does not dispute her mental condition is in controversy in her Response.  Doc. 28.  Indeed, Plaintiff has clearly asserted a mental injury in her Complaint. Plaintiff alleges suffered severe injuries "to her brain and spinal column, causing seizures, blackouts, and additional ongoing neurological problems."  Doc. 1-1 at 3.  Thus, the Court finds Plaintiff has put her mental condition in controversy in this case.

The Court proceeds to the second inquiry—whether Defendant has made a showing of good cause for both IMEs.  Defendant argues the IMEs are necessary because it needs additional information regarding damages and causation.  Doc. 21-1 at 9–10.  Defendant asserts there are no other alternative discovery procedures through which it could gather sufficient information regarding Plaintiff's mental condition.  Id. at 9.  Defendant also argues it should not be required to rely on Plaintiff's treating physicians to determine the nature and extent of Plaintiff's damages.  Id. at 10.

In response, Plaintiff does not necessarily argue Defendant has failed to show good cause, but, instead, the potential health risks involved with the examinations negate any good cause Defendant has shown.  Doc. 28 at 3.  Plaintiff also asserts both a neuropsychological and neuropsychiatric exam would be cumulative.  Id. at 4.  Plaintiff does not challenge the selection of the two doctors Defendant has identified to conduct the examinations.

Defendant has shown good cause to conduct both IMEs.  Because Plaintiff's mental condition is directly at issue in the case, Defendant should be able to investigate the "existence and nature of such asserted injury."  Schlagenhauf, 379 U.S. at 119.  There are not reasonable

3

alternatives for Defendant to discover causation issues and the full extent of Plaintiff's damages. In addition, Plaintiff has retained her own experts and apparently intends to prove her claims through expert testimony. Doc. 21-1 at 5 n.5, 8; Doc. 28 at 3 n.1. The Court should "preserve the equal footing of the parties" by permitting Defendant to investigate Plaintiff's injuries alleged in her Complaint with its own experts. Ornelas, 292 F.R.D. at 392.

Plaintiff cites no relevant authority for her assertion a possible health risk negates good cause for an examination under Rule 35. Moreover, Plaintiff has not produced convincing proof these medical exams would be a real danger to her. Plaintiff has produced an affidavit from one of her physicians, Dr. Syed Asad, who also may serve as an expert in this case. Doc. 28-1. In the affidavit, Dr. Asad states Plaintiff "*could* suffer a non-epileptic seizure as a result of this type of examination." Id. at 2 (emphasis added). Dr. Asad does not state Plaintiff will experience a seizure with any degree of certainly or likelihood, only that it is a possibility. Dr. Asad bases his opinion on the fact Plaintiff "would be questioned in a foreign location, by an individual she is meeting for the first time and being required to re-live the event and her symptoms in detail for several hours, in an environment where she is likely aware the clinician is hired by the defense and is not there to treat her on-going issues." Id. Under Dr. Asad's reasoning, Plaintiff would likely be unable to actively participate in this litigation without risking a possible seizure. Dr. Asad does not explain why these types of medical examinations in particular will cause Plaintiff harm. Defendant appropriately points out Plaintiff has seen numerous providers for treatment of her injuries at issue in this case. Doc. 30 at 3–4. These providers include her own litigation-retained experts. Id. at 4; Doc. 27 at 10. While the Court is sympathetic to Plaintiff's health concerns, Dr. Asad's affidavit—without more—fails to demonstrate the requested examinations are likely to cause any adverse health effects.

4

Even if the Court were to accept Dr. Asad's opinion that examinations could cause Plaintiff harm, she has already assumed the risk of harm by submitting herself to examinations by her own litigation-retained experts. It would be unfair to permit Plaintiff to prevent Defendant from conducting its own independent examinations to investigate the injuries centrally at issue in this case. See Ornelas, 292 F.R.D. at 392. Plaintiff has also assumed any risk of harm by filing this lawsuit in which she alleges her mental condition is at issue. In sum, it would be inappropriate to allow Plaintiff to rely on the very condition of which she complains to thwart Defendant's ability to prove it did not cause that condition. McDonald v. Southworth, No. 1:07-CV-217, 2008 WL 2705557, at *4 (S.D. Ind. July 10, 2008) (citation omitted).

Additionally, both a neuropsychological and neuropsychiatric examination are not cumulative. These are different examinations that will provide different information to Defendant. Douglas P. Gibson, Defendant's proposed neuropsychologist, explains the neuropsychological evaluation will consist of forensic testing, which includes psychometric tests that measure cognitive functioning, to determine what may explain Plaintiff's continuing symptoms. Doc. 21-2 at 3, 4. In contrast, the neuropsychiatric evaluation involves a review of the person's relevant history and rendering a diagnosis and possible treatments. Doc. 21-6 at 3. Thus, it appears the neuropsychological evaluation will be most relevant to causation issues, while the neuropsychiatric evaluation will be more relevant to determining the full extent of Plaintiff's mental health injuries. See Van Sice v. Oldcastle Glass, Inc., Civil Action No. 03-BB-114, 2005 U.S. Dist. LEXIS 550, at *7 (D. Colo. Jan. 10, 2005) ("The neuro-psychologist examined the plaintiff in connection with and will testify about the plaintiff's claimed cognitive injuries; the psychiatrist, by contrast, will examine the plaintiff and is expected to testify about the mental health injuries claimed . . . ."). As discussed above, Defendant has shown Plaintiff's

5

mental condition is in controversy and good cause for the exams. "Rule 35 does not otherwise limit the number of examinations a party may be required to undergo, nor would such a limitation be judicious." Ornelas, 292 F.R.D. at 392. Therefore, Defendant is entitled to conduct both a neuropsychological and neuropsychiatric examination. The Court **GRANTS** Defendant's Motion to Compel.

## II.  Limitations on the Exams

Plaintiff argues the Court should impose limitations if the IMEs are permitted to go forward. Doc. 28 at 4–5. The Court addresses each of these requested limitations in turn.

### A.  Paperwork

Defendant represents there was at least initially a dispute regarding paperwork required during the examinations. Doc. 21-1 at 14–15; Doc. 27 at 3. However, Plaintiff does not discuss this issue or request any limitation regarding paperwork in her Response. Doc. 28. Thus, the Court **DENIES as moot** this request and imposes no limitations as to paperwork Plaintiff must complete in connection with the examinations.

### B.  Travel

Plaintiff contends Defendant should not force Plaintiff to travel outside of the Southern District of Georgia or Jacksonville area for any exams. Id. at 9–10. Defendant states it is not opposed to this request. Doc. 30 at 14 n.26; Doc. 27 at 2 n.1. Thus, the Court **GRANTS as unopposed** Plaintiff's request. Both examinations will occur in the Southern District of Georgia or the Jacksonville, Florida area.

### C.  Recording and Presence of Counsel

Plaintiff argues she should be permitted to record the examination and have counsel present even if the examination is permitted to go forward. Doc. 28 at 5–8. At the outset, the

Court notes there are important differences between the neuropsychiatric and neuropsychological exams. As explained above, one of the purposes of a neuropsychiatric exam is to gather personal history of the present illness. Doc. 21-6. Thus, "[h]aving a family member present is allowed, even encouraged, as observations from caregivers can assist in providing elements of the history." Id. In contrast, the neuropsychological evaluation will be used to address causation and possible malingering of symptoms. Doc. 21-2 at 3. Thus, Dr. Gibson, the expert who will conduct the neuropsychological evaluation, states a third-party observer would never be appropriate during this type of examination. Id. at 5. He further explains an observer would invalidate the test results, affect the examinee's actual performance, and compromise test security. Id. at 5–6.

### 1. *Legal Standard.*

Rule 35 examinations, like all other forms of discovery, are subject to the general provisions of Rule 26(c). Bethel v. Dixie Homecrafters, Inc., 192 F.R.D. 320, 323 (N.D. Ga. 2000) (quoting Tirado v. Erosa, 158 F.R.D. 294, 297 (S.D.N.Y. 1994)). Rule 26(c) states, "The court may for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including . . . designating the persons who may be present while the discovery is conducted . . . ." Fed. R. Civ. P 26(c)(1)(E).

"Most courts analyze a request for a recording device the same way they evaluate whether to permit the presence of an attorney at a Rule 35 . . . examination." Kropf v. Celebrity Cruises, Inc., No. 14-CV-21599, 2014 WL 6682533, at *3 (S.D. Fla. Nov. 25, 2014) (quoting Lerer v. Ferno-Washington, Inc., No. 06-081031, 2007 WL 3513189, at *1 (S.D. Fla. Nov. 14, 2007)). To determine if such conditions should be placed on an IME, courts have determined "the party seeking to have the observer or recording device present bears the burden of

7

demonstrating 'good cause' for the request . . . ." Id. (quoting Lerer v. Ferno-Washington, Inc., No. 06-081031, 2007 WL 3513189, at *1 (S.D. Fla. Nov. 14, 2007); see also Jackson v. Deen, No. CV412-139, 2013 WL 2027398, at *5 (S.D. Ga. Apr. 3, 2013) (citing Heath v. Isenegger, 2011 WL 2610394, at *2 (N.D. Ind. 2011) (ordering examination would proceed unrecorded reasoning recording is only available when good cause is shown)); Trainor v. Fla. Dirt Source, LLC, No. CV418-289, 2019 WL 5849087, at *2 (S.D. Ga. Nov. 7, 2019) (not permitting attorney presence or recording at examination).

To determine if the party requesting conditions on a Rule 35 IME has shown good cause, "[t]he appropriate inquiry is whether special circumstances are present which call for a protective order tailored to the specific problems presented." Calderon v. Reederei Claus-Peter Offen GMBH & Co., 258 F.R.D. 523, 526 (S.D. Fla. 2009) (quoting Tirado v. Erosa, 158 F.R.D. 294, 299 (S.D.N.Y. 1994)). Thus, whether Plaintiff can record the examinations or have counsel present depends on whether she has shown good cause to do so.

This Court has held protection from bias, misrepresentation, and the adversarial process alone does not show good cause. In Castle-Foster, a plaintiff severely injured in a car accident sought to condition the Rule 35 IME by requesting his attorney's presence or the recording of the examination. Castle-Foster v. Cintas Corp. No. 2, No. CV419-139, 2021 WL 601877, at *2 (S.D. Ga. Feb. 16, 2021). The plaintiff sought these conditions on the examination because he questioned the objectivity of the defendant's examiners. Id. at *3. The Court held protection from "bias or misrepresentation on the part of the examiner" was not enough to warrant attorney presence or a recording of the examination reasoning that such conditions would be "unnecessary, improper and risk invalidating the procedure itself." Id. at *4.; see Trainor, 2019 WL 5849087, at *2 (expressing similar reasoning).

8

### 2. *Analysis.*

The Court finds Plaintiff has not met her burden in showing good cause to record the examinations or to have her counsel present during the examinations. Plaintiff argues the IMEs should be recorded and counsel should be present because several other courts have recognized the importance of these proposed limitations. Doc. 28 at 5, 6. However, the majority of case law Plaintiff cites originates from other circuits. The single district court case within the Eleventh Circuit Plaintiff cites, Goggins v. State Farm Mut. Auto. Ins. Co., No. 3:10-cv-00826, 2011 WL 1660609, at *2 (M.D. Fla. July 12, 2013), reasons courts will look to the corresponding state rules for guidance. Even if this Court were to look to corresponding state rules for guidance, the applicable substantive law in this case would be Georgia law rather than Florida law.[1] Plaintiff cites no Georgia case law, statute, or rule that would support her request for recording and the presence of counsel.

Additionally, the Court is not persuaded by Plaintiff's argument Defendant's examiners would take the opportunity to "re-depose the plaintiff without their counsel present" or fail to call paramedics in the event of a medical emergency. Doc. 28 at 7–8. Plaintiff alleges Defendant's experts would refuse to call paramedics in the midst of a medical emergency without offering any support for such a claim. This is mere speculation. Moreover, it is undisputed the presence of a family member is encouraged during the neuropsychiatric exam, and Plaintiff's family member could assist in the event of a medical emergency. Additionally,

---

[1] A minority of courts have looked to state law to determine whether to allow certain conditions on Rule 35 IMEs. Goggins, 2011 WL 1660609, at *2 (citing Vreeland v. Ethan Allen, Inc., 151 F.R.D. 551, 551 (S.D.N.Y. 1993); and then citing Gensbauer v. May Dep't Stores Co., 184 F.R.D. 552, 553 (E.D. Penn. 1999)). It should be noted Goggins "is an exception to the rule in federal district courts." Hacking v. United States, No. 19-14449, 2021 WL 1342494, at *2 (S.D. Fla. Feb. 16, 2021); see also Button v. Royal Caribbean Cruises Ltd., No. 12-23624, 2013 WL 12064490, at *5 (S.D. Fla. July 12, 2013); McKisset v. Brentwood BWI One LLC, No. WDQ-14-1159, 2015 WL 8041386, at*3–4 (D. Md. Dec. 4, 2015).

Plaintiff has not argued her counsel's knowledge of her personal history would contribute to the neuropsychiatric examination in any way. As for the neuropsychological examination, counsel's presence could actively undermine the findings of the examination. Doc. 21-2 at 3. Plaintiff has not shown a strong enough need for counsel's presence during the neuropsychological examination to warrant compromising the examination procedures. Therefore, Plaintiff has not made a showing of good cause for recording or to have her counsel present during either of the IMEs. The Court **DENIES** these requests.

### D. Raw Data and Test Materials

Plaintiff also argues she should receive the raw data from these examinations, even if she does not retain an expert for the purposes of interpreting the data. Doc. 28 at 8. Although not specifically stated, Plaintiff is presumably referring to the neuropsychological examination to be completed by Dr. Gibson. Doc. 27 at 4–5. Defendant represents there has been a dispute about producing the testing materials used during this examination. Id. at 5.

Plaintiff's argument is based in the Federal Rules of Civil Procedure. Federal Rule of Civil Procedure 35(b)(2) requires an expert's report to contain all of the examiner's findings, including diagnoses, conclusions, and the results of any tests. Additionally, Federal Rule of Civil Procedure 26(a)(2)(B)(ii) requires an examiner to produce the "facts and data" he considered in forming his opinions when producing an expert report.

Defendant sets forth two primary arguments in opposition to Plaintiff's request: (1) the professional ethics rules for psychologists prohibit Dr. Gibson from producing raw data to a non-psychologist; and (2) production of the test materials used would interfere with copyright and contractual obligations with the company that produces the test. Regarding ethical constraints, Defendant points to the ethics rules set forth by the American Psychological Association

("APA") and cites to a 1999 law review article entitled When Ethics Collide in support. Doc. 27 at 5–7.  Nola Nouryan & Martha S. Weisel, When Ethics Collide: Psychologists, Attorneys & Disclosure, 36 Cal. W. L. Rev. 125 (1999); Doc. 27 at 5.  At the time of publication of When Ethics Collide, the official APA Ethics Code directed psychologists to refrain from "releasing raw test results or raw data to persons . . . who are not qualified to use such information."  Ethical Principles of Psychologists & Code of Conduct § 2.02 (Am. Psych. Ass'n 1992).

However, in 2002, the APA replaced Ethical Standard 2.02 with Ethical Standard 9.04.[2] Ethical Standard 9.04 no longer discusses whether individuals are "qualified" to use raw data. Instead, Ethical Standard 9.04 states, "Pursuant to a client/patient release, psychologists provide test data to the client/patient or other persons identified in the release.  Psychologists may refrain from releasing test data to protect a client/patient or others from substantial harm or misuse or misrepresentation of the data or the test, recognizing that in many instances release of confidential information under these circumstances is regulated by law."  Ethical Principles of Psychologists & Code of Conduct § 9.04 (Am. Psych. Ass'n 2017).  An additional subsection was added to this rule, which states, "In the absence of a client/patient release, psychologists provide test data only as required by law or court order."  Id.  Comparing the old text of Ethical Standard 2.02 to the new text of Ethical Standard 9.04, the APA has shifted its focus from prohibiting non-psychologists' access to raw data to allowing some disclosure of such data if the patient consents.  The rules also recognizes the need to produce information when required by

---

[2]     The relevant changes can be viewed on the APA's website.  Redline Comparison of APA Ethical Principles of Psychologists and Code of Conduct, December 1992 and December 2002, American Psychological Association (2002), https://www.apa.org/ethics/code/92-02codecompare.pdf (last visited July 23, 2021).

11

law.  Thus, Defendant has failed to present any current ethical guidelines that would preclude the production of test data to non-psychologists, especially within the context of a legal dispute.

Second, Defendant argues production of the test materials used would interfere with copyright and contractual obligations with the company that produces the test.  Doc. 27 at 7–10.  Both the 1992 and 2003 versions of the APA Ethics Code recognize the importance of maintaining the integrity and security of test materials.  Ethical Principles of Psychologists & Code of Conduct § 2.10 (Am. Psych. Ass'n 1992); Ethical Principles of Psychologists & Code of Conduct § 9.11 (Am. Psych. Ass'n 2017).  Defendant also notes the publishers of the test materials have stringent rules regarding disseminating their test materials, which they consider to be trade secrets.  Doc. 27 at 8.  To provide an overview of these policies, Defendant included Pearson's Legal Policies to the users of its many psychological testing materials.  Doc. 21-2 at 25–27.  Defendant provided a partial summary of these policies in its Motion to Compel.  Doc. 27 at 8–9.  However, Defendant did not refer to the section of Pearson's policies which specifically address litigation.  Pearson's litigation policies state, "Should litigation in which a psychologist is involved reach the stage where a court considers ordering the release of proprietary test materials to non-professionals such as counsel, we request that the court issue a protective order prohibiting parties from making copies of the materials . . . ."  Doc. 21-2 at 27.

Recognizing the ethical and contractual conflicts in this area, courts have taken a variety of approaches.  Taylor v. Erna, No. CIVA 08-10534, 2009 WL 2425839, at *2 (D. Mass. Aug. 3, 2009) (collecting cases).  These approaches include ordering full disclosure without qualification, requiring disclosure only to opposing counsel's qualified expert witness, or issuing a protective order.  Id.  The Court is sympathetic to Dr. Gibson's concerns; thus, it will not order full disclosure without qualification.  However, both parties represent Plaintiff has not

retained a qualified psychologist expert who could review these materials, and the Court will not require Plaintiff to retain such an expert solely to review the data and materials which underly Dr. Gibson's opinion. However, there is no indication a protective order would not resolve Dr. Gibson's concerns. Thus, the Court **GRANTS** Plaintiff's request for raw data and test materials, but only subject to entry of a protective order. The parties must submit a proposed protective order for the Court's consideration within **21 days** of this Order. Data need not be released until the Court enters a protective order. Additionally, if Plaintiff does retain a licensed psychologist as an expert, the data and test materials can be released directly to that individual and without the need for a protective order.

## CONCLUSION

For the reasons explained above, the Court **GRANTS** Defendant's Motion to Compel. Plaintiff will not be permitted to record the examinations or have her counsel present. However, the examiners will be required to disclose the raw data and test materials to Plaintiff. Defendant may submit a proposed protective order to the Court if it sees fit. If the parties need an extension of discovery deadlines in this case in order to conduct the requested examination, they should confer and then file a motion and proposed scheduling order. See Doc. 27 at 2 n.1.

**SO ORDERED**, this 23rd day of July, 2021.

_____
BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA